1  MARA W. ELLIOTT, City Attorney
   MARK ANKCORN (SBN 166871)
2  Senior Chief Deputy City Attorney
   *mankcorn@sandiego.gov*
3  **OFFICE OF THE CITY ATTORNEY**
   1200 Third Avenue, Suite 1100
4  San Diego, California 92101
   Telephone: (619) 533-5800
5  Facsimile: (619) 533-5856

6
   *Attorneys for Plaintiff, The City of San Diego*
7

8              **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10
   THE CITY OF SAN DIEGO,              Case No. **'24CV2061 AGS DEB**
11
12  PLAINTIFF,                         COMPLAINT

13     V.                              JURY TRIAL DEMANDED

14  HESS CORPORATION;
    EXXON MOBIL CORPORATION;
15  PERMIAN RESOURCES CORP.
    F/K/A CENTENNIAL RESOURCE
16  DEVELOPMENT, INC.;
    CHESAPEAKE ENERGY
17  CORPORATION; CONTINENTAL
    RESOURCES, INC.;
18  DIAMONDBACK ENERGY, INC.;
    EOG RESOURCES, INC.;
19  OCCIDENTAL PETROLEUM
    CORPORATION; AND
20  PIONEER NATURAL RESOURCES,
21
22  DEFENDANTS.

23
24
25
26
27
28

# TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION ...................................................................................... 1

II.    PARTIES ...................................................................................................... 3

III.   JURISDICTION, VENUE, AND COMMERCE ..................................... 7

IV.    FACTUAL ALLEGATIONS ..................................................................... 8

    A.   Background and History of Shale Oil ............................................. 8

    B.   OPEC's Background and Price War Against U.S. Shale ......................... 11

    C.   OPEC's Campaign to Bring Cowboyistan into the Cartel ..................... 13

    D.   Defendants Begin to Cooperate with OPEC ......................................... 18

    E.   Defendants Conspire with OPEC in 2022 and 2023 ............................... 20

    F.   Factors that Show Defendants' Collusion to Restrict Production of Crude Oil ....... 23

V.     DEFENDANTS' INFLUENCE ON GLOBAL OIL PRICES ......................... 24

VI.    FURTHER INDICATORS OF COLLUSION ..................................... 26

VII.   INJURY RELATED TO ANTITRUST ................................................. 27

    G.   During the Relevant Period, Defendants' Conspiracy to Limit Shale Oil Production Inflated the Price of Crude Oil. ............................ 27

    H.   Defendants' Agreement to Limit Shale Oil Production Drove up Prices of Gasoline and Diesel Fuel Purchased by the Plaintiff ....................... 28

VIII.  CLAIMS FOR RELIEF ............................................................................ 31

    FIRST CLAIM FOR RELIEF ..................................................................... 31

        VIOLATION OF THE SHERMAN ACT .................................... 31

    SECOND CLAIM FOR RELIEF ............................................................... 32

        VIOLATION OF CALIFORNIA CARTWRIGHT ACT ................ 32

    THIRD CLAIM FOR RELIEF ................................................................... 33

        VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW ........ 33

IX.    PRAYER FOR RELIEF ............................................................................ 34

X.     JURY TRIAL DEMANDED ..................................................................... 35

TABLE OF CONTENTS

The City of San Diego ( the "City" or "Plaintiff") brings this antitrust lawsuit for treble damages and injunctive relief against Defendants Hess Corporation, Exxon Mobil Corporation, Permian Resources Corporation (f/k/a Centennial Resource Development, Inc.); Chesapeake Energy Corporation; Continental Resources Inc.; Diamondback Energy, Inc.; EOG Resources, Inc.; Occidental Petroleum Corporation; and Pioneer Natural Resources Company (collectively "Defendants").

# I.  **INTRODUCTION**

1.      This case is about a conspiracy by major U.S. producers of shale oil, their Wall Street investors, the Organization of Petroleum Exporting Countries ("OPEC"), and non-OPEC member countries aligned with OPEC ("OPEC+") to restrict the production of crude oil. Shale oil is crude oil. It is produced from petroleum-bearing formations with low permeability that are hydraulically fractured to produce oil—also known as "fracking."

2.      The purpose and effect of Defendants' conspiracy was and continues to be maintaining, fixing, and raising the price of crude oil in and throughout the United States of America. Defendants agreed to limit their respective shale production volumes. This has had and continues to have, the effect of fixing and/or stabilizing and/or maintaining U.S. and global crude oil prices at artificially high levels, which fixes and/or stabilizes and/or maintains gasoline and diesel fuel prices at an artificially high level in the United States.

3.      Defendants did not raise crude oil prices by small amounts. On the contrary, Defendants' conspiracy had a massive impact on retail and rack rate gasoline and diesel. While the precise effects of the Defendants' conspiracy are yet to be fully ascertained, the following graph illustrates the impact.[1]

---

[1] Source www.eia.gov.

1
2
3
4
5
6
7
8
9
10
11
12
13



14    4.    Defendants' actions as a cartel constitute per se unlawful restraint of

15  trade under state antitrust and competition laws. Plaintiff brings this suit to recover

16  the substantial harm and loss suffered due to the supra-competitive prices they paid

17  for gasoline or diesel for commercial use as a direct and proximate result of the acts

18  of the cartel to constrain domestic production of shale oil in the United States.

19    5.    The U.S. Federal Trade Commission ("FTC") investigated and found

20  that former CEO and founder of Defendant Pioneer Natural Resources Company

21  ("Pioneer"), Scott Sheffield ("Sheffield") "campaigned to organize anticompetitive

22  coordinated output reductions between and among U.S. crude oil producers, and

23  others, including" OPEC and OPEC+. See Complaint ¶ 1, In the Matter of Exxon

24  Mobil  Corporation  (May  2024)  ("FTC  Compl."). Sheffield's  private

25  correspondence and public statements revealed that his "goal in the recent years at

26  Pioneer has been to align U.S. oil production with OPEC and OPEC+ country

27  output agreements, thereby cementing the cartel's position and sharing in the spoils

28  of its market power." See FTC Compl. ¶ 3. Sheffield repeatedly met with and had

private conversations with high-ranking OPEC representatives in which he assured them "that Pioneer and its Permian Basin rivals were working hard to keep oil output artificially low." FTC Compl. ¶ 5 (citing a WhatsApp chat). This was part of Sheffield's "sustained and long-running strategy to coordinate output reductions[.]" *Id.* ¶ 6. The FTC subsequently barred Sheffield from joining Exxon Mobil's Board of Directors – as part of Exxon's agreement to acquire Pioneer in 2024, because his joining the Board violated antitrust laws. See FTC Compl. ¶ 2. The FTC subsequently opened a full-scale investigation into the U.S. shale oil industry – including the private communications of industry executives – and has referred the matter to the U.S. Department of Justice for potential criminal prosecution.[2]

6.     The City of San Diego (the "City" or "Plaintiff") is a victim of this conspiracy to limit oil production. Plaintiff paid more than it should have for the products crude oil is produced to make: "light petroleum products," meaning motor gasoline, distillate fuel and jet fuel. Plaintiff brings this antitrust lawsuit to reclaim incurred losses and obtain injunctive relief that will end this collusion.

## II.    **PARTIES**

7.     Plaintiff the **City of San Diego** is a municipal corporation established pursuant to Article XI, Section 3 of the California Constitution. During the relevant time period, Plaintiff purchased light petroleum products, and it was injured by the illegal conduct described herein by paying more for those products than it would have but for Defendants' conduct.

8.     Defendant **Hess Corporation** ("Hess") is a publicly traded Delaware Corporation headquartered in New York. It is a significant producer of crude oil from shale oil formations in North Dakota. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock

---

[2] *See* Mitchell Ferman, Leah Nylen, and Jennifer Dlouhy, "FTC Eyes Oil Bosses' Texts for Signs of Collusion With OPEC," Bloomberg (July 19, 2024); see Liz Hoffman and Gina Chon, "FTC plans to recommend a possible criminal case against ex-Pioneer CEO," Semafor (May 2, 2024).

trades on the New York Stock Exchange under the "HES" ticker symbol.

9.     Defendant **Exxon Mobil Corporation** ("Exxon") is a publicly traded New Jersey Corporation headquartered near in Spring, Texas. It is a significant producer of crude oil from shale oil formations, largely in the Permian Basin, Bakken Formation, Woodford Shale, Caney Shale and the Gulf of Mexico. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "XOM" ticker symbol.

10.    Defendant **Permian Resources Corporation** is a publicly traded Delaware corporation headquartered in Midland, Texas. It is a major producer of crude oil from shale oil formations, largely in the Permian Basin in Texas and New Mexico. Permian was formed in 2022 in a transaction between Centennial Resource Development, Inc. ("Centennial") and Colgate Energy Partners III, LLC. During most of the period relevant to this complaint, it was known as Centennial. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "PR" ticker symbol.

11.    Defendant **Chesapeake Energy Corporation** ("Chesapeake") is a publicly traded Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. It is a major producer of crude oil from shale oil formations, with operations in Louisiana and Pennsylvania. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the NASDAQ Stock Market under the "CHK," "CHKEW," "CHKEZ," and "CHKEL" ticker symbols.

12.    Defendant **Continental Resources Inc.** ("Continental") is an Oklahoma Corporation headquartered in Oklahoma City, Oklahoma. It is a significant producer of crude oil using shale oil formations, with operations in North Dakota, Montana, Oklahoma, Texas, and Wyoming. Continental sells crude oil into

the U.S. domestic market where it is refined and disseminated across the country. Until November 22, 2022, its common stock traded on the New York Stock Exchange under the "CLR" ticker symbol. Thereafter, the company became privately owned by Harold Hamm, the company's founder, who purchased it through a series of take-private transactions with Omega Acquisition Inc.

13.    Defendant **Diamondback Energy, Inc.** ("Diamondback") is a publicly traded Delaware Corporation headquartered in Midland, Texas. It is a major producer of crude oil using shale oil formations in Texas. Diamondback sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the NASDAQ Stock Market under the "FANG" ticker symbol.

14.    Defendant **EOG Resources, Inc.** ("EOG") is a publicly traded Delaware Corporation headquartered in Houston, Texas. EOG is a major producer of crude oil from oil shale formations with operations covering North Dakota, Wyoming, Colorado, Oklahoma, Texas, New York, Pennsylvania, and New Mexico. It sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "EOG" ticker symbol.

15.    Defendant **Occidental Petroleum Corporation** ("Occidental") is a publicly traded Delaware Corporation headquartered in Houston, Texas. It is a major producer of crude oil from shale oil formations in Colorado, Texas, and New Mexico. Occidental sells crude oil into the U.S. domestic market where it is refined and disseminated across the country. Occidental's common stock and warrants to purchase common stock trade on the New York Stock Exchange under the "OXY" and "OXY WS" ticker symbols, respectively.

16.    Defendant **Pioneer Natural Resources Company** ("Pioneer") is a publicly traded Delaware Corporation headquartered in Irving, Texas. Pioneer is a significant producer of crude oil from shale oil formations in Texas. It sells crude

oil into the U.S. domestic market where it is refined and disseminated across the country. Its common stock trades on the New York Stock Exchange under the "PDX" ticker symbol.

17.    Each and every Defendant was a co-conspirator with the other Defendants and committed overt acts in furtherance of the conspiracy alleged herein in this District and in the United States.

18.    "Defendants," as used herein means each of Centennial, Chesapeake, Continental, Diamondback, EOG, Hess, Exxon, Occidental, and Pioneer. Unless stated otherwise, where an action by "Defendants" is alleged, it is alleged that each Defendant undertook the alleged action. "Defendants," as used herein, refers to and includes each of the named Defendants' predecessors, successors, parents, wholly-owned or controlled subsidiaries or affiliates, employees, officers, or agents.

19.    Though each Defendant may have subsidiaries and affiliates with separate corporate forms, each Defendant's officers, employees and agents habitually refer to the Defendant and its subsidiaries collectively, not making legal distinctions among related corporate entities. Whenever reference is made to any act of any organization, corporation, or other business entity, the allegation means that the entity engaged in the act by or through its officers, directors, agents, partners, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

20.    Defendants participated in the alleged conspiracy through the acts of their officers, directors, agents, partners, employees, representatives, affiliates, subsidiaries, and companies they acquired through mergers and acquisitions, for whose acts they are liable.

21.    Co-conspirators known and unknown willingly participated in the alleged conspiracy and acted in furtherance thereof.

COMPLAINT

### III.    JURISDICTION, VENUE, AND COMMERCE

22.    This Court has subject matter jurisdiction over this action pursuant to Sections 1 the Sherman Act, 15 U.S.C. § 1 and Section 16 of the Clayton Act, 15 USC § 26, and 28 U.S.C. §§ 1331 and 1337(a).

23.    This Court has jurisdiction over the state law claims (1) under 28 U.S.C. § 1367, because the state law claims are so related to the federal claim that it forms part of the same case or controversy, and (2) under 28 U.S.C. § 1332, because the amount in controversy exceeds $5,000,000 and because the Plaintiff is a citizen of a different state than the Defendants.

24.    The Defendants are subject to personal jurisdiction in this Court under (without limitation): (1) 15 U.S.C. § 22; (2) California's long-arm statute, Cal. Code Civ. Proc. § 410.10; and (3) the conspiracy theory of jurisdiction. Each Defendant was formed in or has its principal place of business in the United States, transacted business throughout the United States, including in this District, and had substantial contacts with the United States, including in this District, and committed overt acts in furtherance of their illegal scheme and conspiracy in the United States.

25.    The conspiracy was carried out in substantial part in the United States, and was directed at, and had the intended and actual effect of causing injury to, the Plaintiff and others residing in, located in, or doing business in the United States.

26.    The Defendants' activities, and those of their co-conspirators, were within the flow of, and were intended to and had a substantial effect on, foreign and interstate commerce.

27.    Venue is proper in this District pursuant to 15 U.S.C. § 15(a) and 22 U.S.C. §§ 1391(b) and (c) because during the relevant period the Defendants transacted business and had agents in this District, a substantial part of the events or omissions giving rise to these claims occurred in this District, and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

28.    Defendants' activities were within the flow of, and were intended to and did have a substantial effect on, interstate commerce of the United States. Defendants' products and services are sold in the flow of interstate commerce.

29.    By reason of the unlawful activities alleged herein, Defendants' unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiff. Defendants, directly and through their agents, engaged in activities affecting all states.

30.    Defendants' conspiracy, wrongful anticompetitive conduct, and substantial anticompetitive effects described herein proximately caused injury to Plaintiff.

## IV.    FACTUAL ALLEGATIONS

### A.    Background and History of Shale Oil

31.    Shale oil was produced in connection with major commercial "fracking" around 1988. Volumes of shale oil did not become substantial until around 2011.

32.    Shale oil is a high-quality crude oil found between layers of shale rock and other materials that can be used to produce gasoline, diesel fuel, and other commercial products. Shale oil is produced in a process known as hydraulic fracturing or, "fracking."

33.    Crude oil is a main material in gasoline and diesel fuel. Thus, the price of crude oil is a major factor for the price of gasoline and diesel fuel and approximately 90% of variation in the price of these fuels is directly related to the price of crude. A conspiracy to raise the price of crude oil is also a conspiracy to raise gasoline and diesel fuel prices.

34.    Crude oil is the primary upstream input in gasoline and diesel fuel. Shale oil and other crude oil are sold to refineries, which purchase and combine shale oil produced by Defendants with other shale oil and crude oil extracted with traditional drilling methods. These refineries refine the crude oil into petroleum-

based products, including gasoline and diesel.

35.    Gasoline and diesel fuel are transported to storage terminals, where it is stored and blended for sale to Plaintiff. Today, shale oil is nearly 2/3 of onshore crude oil production in the United States.[3]

36.    Shale drilling – or fracking – was introduced in the early 2000s. This technology would change the entire oil and gas industry, sparking the fastest increase in domestic crude oil production in U.S. history in the years following 2008 (the "Shale Revolution").[4]

37.    Innovations in fracking and drilling technology allowed independent oil producers in the U.S. ("Independents") to produce hydrocarbons economically, causing U.S. oil production to grow from 6.8 million barrels to approximately 12.8 million barrels a day between 2008 and 2015 and to 17.1 million barrels a day by 2019.[5] This allowed the U.S. to surpass Saudi Arabia and Russia as the world's largest producer.[6]

38.    Notably, the development of horizontal drilling significantly helped grow U.S. oil production. Traditional vertical drilling typically extracts oil from a single point, whereas horizontal drilling enables a single well pad to access hydrocarbons over a much larger area. Horizontal drilling and improvements in imaging and computer technology increased well productivity because shale

---

[3] How Much Shale (Tight) Oil is Produced in the United States? EIA (Mar. 27, 2023), https://www.eia.gov/tools/faqs/faq.php?id=847&t=6.

[4] *See* Zhongmin Wang and Alan Krupnik, *A Retrospective Review of Shale Gas Development in the United States: What Led to the Boom*? (Resources for the Future Discussion Paper 13-12, Apr. 2013) at 1, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://media.rff.org/documents/RFF-DP-13-12.pdf

[5] *See Javier Blas*, "Wall Street Is Finally Going to Make Money Off the Permian," BLOOMBERG (April 24, 2023), https://www.bloomberg.com/opinion/articles/2023-04-24/higher-oil-prices-means-wall-street-s-shale-investments-will-finally-pay-off?embedded-checkout=true.

[6] *Id.*

1    companies were able to target more productive formations.[7]

2    39.    Before shale fracking became viable, massive conventional projects

3    dominated the oil and gas industry, often requiring years of construction and

4    complicated planning. Shale drilling is far more efficient because it involves drilling

5    smaller and more productive wells on a shorter and more efficient timeline. Major

6    technological advances in shale drilling, drilling technology, and business logistics

7    made shale drilling even more economically feasible. Such innovations are shown

8    in the graphic above.[8]

9    40.    Because of these innovations, by the 2010s, U.S. shale oil producers

10   had already developed very efficient drilling methods, making them major

11   competitors with OPEC. The production of shale oil was more responsive to



changing prices and real-time conditions than traditional drilling because it required

smaller capital commitments; traditional drilling methods were decades-long

---

[7] *See* Wang & Krupnick, *supra* n.4, at 10.
[8] https://www.fractracker.org/resources/oil-and-gas-101/process/.

1    investments.

2    41.    These developments gave U.S. Independents the power to control oil

3    prices and compete with OPEC by replacing supply held back by OPEC production

4    quotas, increasing production to take advantage of oil prices reaching economically

5    viable levels, and decreasing OPEC's monopoly rents from their control of market

6    supply.

7    42.    Unlike OPEC and OPEC+ nations, U.S. shale producers are subject to

8    the Sherman Act. Therefore, prices and production levels were not set throughout

9    the industry because the comparatively small U.S. shale producers are competitive

10   with each other and with OPEC.

11   43.    By the mid-2010s, U.S. shale oil's presence in the global oil scene

12   threatened OPEC's control over the industry, usurping Saudi Arabia as a swing

13   producer and diminishing OPEC's set cartel price premiums. U.S. shale oil was

14   referred to as "Cowboyistan" because of its power as an oil producer and its wild

15   west approach to drilling.

16   44.    Defendants are some of the largest Independents with the ability to

17   adjust shale oil production levels quickly in response to market conditions to

18   influence the price of crude oil. As such, they have acted as "swing producers" on

19   the global market.

20   **B.    OPEC's Background and Price War Against U.S. Shale**

21   45.    OPEC is an intergovernmental organization comprised of the

22   following 13 oil-producing member nations: (1) Saudi Arabia, (2) Iran, (3) Iraq, (4)

23   Kuwait, (5) Venezuela, (6) Indonesia, (7) Libya, (8) UAE, (9) Algeria, (10) Nigeria,

24   (11) Equatorial Guinea, (12) Congo, and (13) Angola. Historically, OPEC exerted

25   market power over global oil prices by coordinating the production levels of its

26   member nations. OPEC cartelizes the production of oil to impose oligopolistic

27   prices in the oil market.

28   / / /

46.    OPEC nations control close to 40% of the world's oil production and almost 80% of the world's proven crude oil reserves. OPEC effectively controls prices by coordinating its members' production levels, forcing other oil producers to make production decisions based on those prices. OPEC members claim sovereign immunity to the Sherman Act and the United States has not attempted to prosecute OPEC or its nations under antitrust laws.

47.    Around the mid-2010s, OPEC lost a substantial portion of its control over prices when a major shale oil supply from the United States hit the global market. OPEC could no longer sufficiently maintain prices by lowering production without losing market share to other global producers and competitors. In response, OPEC started a two-year price war with U.S. shale oil producers.

48.    Beginning in 2016, OPEC signed agreements with ten additional countries including Russia, to reinforce it market power and expand its cartel. OPEC and OPEC+ coordinate crude oil production levels on a country-level basis to limit their collective output. The cartel controls almost 60% of crude oil production worldwide.

49.    Even with OPEC+, U.S. shale oil producers still reduced OPEC's dominance on the global market, driving OPEC to make room at the table for more oil producers, including Defendants.

50.    OPEC nation-states heavily rely on crude oil prices for their GDP. Thus, in 2014, OPEC started to leverage its control of the industry to destroy the U.S. shale industry because it was beginning to lose its pricing power and because Independents had gained too much of OPEC's market share.

51.    OPEC began the price war by managing production levels and flooding the market to push oil prices down and make U.S. shale oil economically unviable. This caused oil prices to plunge to a low of $27 per barrel. OPEC maintained this global oversupply of crude oil to claw back market share. This sparked more than two years of open global competition (the "OPEC Price War"),

plummeting the price of crude oil.[9]

52.    The price war placed significant pressure on OPEC member countries because their economies rely heavily on oil production. The U.S. energy industry was forced to lay off workers as institutional investors pulled back.[10]

53.    However, the price war only incentivized the U.S. shale oil industry to create more ways to increase efficiency and productivity. These innovations allowed U.S. shale companies to continue profitably competing with OPEC by allowing them to produce shale oil at lower costs.[11] Thus, OPEC's price war failed to destroy the U.S. shale oil industry.

54.    U.S. shale producers remained competitive by cost-cutting, focusing on the most productive shale plays, and holding on through long periods of low prices to add supply when prices improved. As a result, many U.S. shale producers, including Defendants, continued to drill despite the price drop. Instead of destroying U.S. shale oil, the price war consolidated the industry by destroying smaller Independents or forcing them to merge with larger players — like Defendants.

**C.    OPEC's Campaign to Bring Cowboyistan into the Cartel**

55.    Since pushing down oil prices failed, OPEC changed tactics by first making a deal with ten oil producing nations to form OPEC+ in December 2016. This increased its global market share to almost 60% and brought potential competitors into the cartel.

---

[9] www.eia.gov.

[10] *See* Shaun Walker et al., *Recession, retrenchment, revolution? Impact of low crude prices on oil powers*, THE GUARDIAN (Dec. 30, 2015), https://www.theguardian.com/business/2015/dec/30/oil-iran-saudi-arabia-russia-venezuela-nigeria-libya.

[11] *See* Ernest Scheyder and Ron Bousso, *U.S. shale and OPEC share steak in uneasy truce at Houston dinner*, REUTERS (March 6, 2018), CERAWEEK-U.S. shale and OPEC share steak in uneasy truce at Houston dinner | Reuters.

56.    In addition, OPEC began a campaign to bring Cowboyistan into the cartel. In November 2016 OPEC announced an agreement with 11 of its members to reduce oil production by 1.2 million barrels per day for six months to stabilize declining oil prices starting on January 1, 2017.[12] A month later, 11 non-OPEC countries joined the agreement to reduce oil production to 558,000 barrels per day.[13] OPEC's goal was to push oil to $60 a barrel.[14] Next, OPEC approached Defendants and their investors, hoping to reach an agreement on output, minimize free riding, and convince Defendants to forego some opportunities to produce oil at a profit. These negotiations were difficult because they required coordinated production cuts amongst a significant group of U.S. shale producers who were supposed to be competing against each other. If any big Independents were uncooperative, the benefits of cooperation with OPEC would be undercut.

57.    Even so, Independents showed openness to cartelization based on the following reports. On September 8, 2016, Defendant Continental CEO Harold Hamm signaled to OPEC that Continental and other Defendants were open to cooperation. He stated that "it is 'high time' for Russia and the Organization of Petroleum Exporting Countries to forge a pact that would put an end to [the] slide in crude oil prices," and thought that major crude oil producers "need to settle on a plan to stabilize oil prices sooner rather than later." [15]

58.    Defendants began having dinners and meetings with OPEC members

[12] "OPEC and Non-OPEC Crude Oil Production Agreement: Compliance Status," at 1 (Nov. 16, 2017).

[13] "OPEC and Non-OPEC Crude Oil Production Agreement: Compliance Status," at 1 (Nov. 16, 2017).

[14] *See* Laurence Arnold, *Why OPEC's Breakthrough Might Be Short-Lived: QuickTake Q&A*, BLOOMBERG (Dec. 1, 2016), Why OPEC's Breakthrough Might Be Short-Lived: QuickTake Q&A - Bloomberg.

[15] Mark DeCambre, *Harold Hamm Says It Is 'High Time' for an OPEC Pact to Freeze Output*, MARKETWATCH (Sept. 8, 2016), https://www. https://www.marketwatch.com/story/trumpspotential-energy-czar-says-its-high-time-for-an-opec-pact-to-freeze-output-2016-09-08.

at industry events worldwide starting in early 2017. The earliest meetings occurred at the 2017 CERAWeek Conference where OPEC's General Secretary Barkindo attended dinners with around two dozen U.S. shale executives including representatives from Defendants Pioneer Natural Resources, Co., Hess Corp., Chesapeake Energy Corp., and Concho Resources Inc.[16] This was purportedly the second time OPEC officials met with U.S. shale producers and the meetings opened up a line of communication.

59.    Reportedly at these meetings, OPEC and U.S. shale executives agreed that a more balanced market and lower inventories would be mutually beneficial.[17] However, U.S. shale companies indicated that they were reluctant to give up on growth and bear the cost of lower inventories.[18] OPEC indicated willingness to enrich the shale producers to bring up prices.[19] OPEC and U.S. shale executives exchanged vital information at these meetings including information about production, cost structure, future projections, supply, and inventory.

60.    The meetings were cartel negotiations because they exchanged information about inventory, cost, capacity, and production. This was the first step in negotiations for setting prices and future production levels.

61.    Later that year, OPEC's Secretary General Barkindo noted that Defendants started to "ask questions about how to proceed [alongside OPEC] in a

---

[16] Javier Blas & Grant Smith, *OPEC Head to Meet with U.S. Shale Producers for Dinner Next Week*, BLOOMBERG (Feb. 27, 2018), https://www.bloomberg.com/news/articles/2018-02-27/opec-head-tomeet-u-s-shale-oil-producers-for-dinner-next-week.

[17] Javier Blas, *OPEC Said to Break Bread With Shale in Rare Show of Détente*, BLOOMBERG (Mar. 7, 2017), https://www.bloomberg.com/news/articles/2017-03-07/opec-said-to-break-bread-with-shalein-rare-show-of-detente (emphasis added).

[18] *Id.*

[19] *Id.*

responsible manner."[20] He also indicated that there was an understanding from meetings with Defendants Hess and Continental Resources that the price was bad for all parties and called for U.S. shale producers to share responsibility for oil price.[21]

62.    These dialogues continued in the 2018 CERAWeek Conference where Secretary Barkindo gave a speech at a dinner announcing OPEC's views on the oil market and encouraged everyone to work together.[22]  The then CEOs of Defendants Pioneer and Centennial attended that dinner.[23]  At this dinner, the parties exchanged information that could be used to coordinate production and stabilize prices, including information about the current cycle, previous cycles, and forward-looking production expectations and projections.[24] Defendants had gained "a seat at the

---

[20] Anjli Raval, *OPEC Secretary General: 'No Doubt' Oil Market is Re-Balancing*, FIN. TIMES (Oct. 19, 2017), https://www.ft.com/content/89ddcf13-f338-315a-99ba-366256c7266a.
[21] *Id.*
[22] Ernest Scheyder and Ron Bousso, *CERAWEEK-U.S. Shale and OPEC Share Steak in Uneasy Truce at Houston Dinner*, REUTERS (Mar. 7, 2018), https://www.reuters.com/article/ceraweek-energyopec-shale/rpt-%20ceraweek-u-s-shaleandopec-share-steak-in-uneasy-truce-at-houston-dinneridUKL2N1QP05R.
[23] *Id.*
[24] *OPEC bulletin Special Edition: OPEC international energy dialogues*, OPEC (May 9, 2018), https://www.opec.org/opec_web/static_files_project/media/downloads/publications/OB022019.pdf, at 51 (emphasis added); *See* Patti Domm, *OPEC Wants to Take Its Relationship with US Shale Producers to the Next Level*, CNBC (Mar. 6, 2018), https://www.cnbc.com/2018/03/06/opec-wants-to-take-its-relationship-withus-shale-producers-to-the-next-level.html (emphasis added); Ernest Sheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweekenergynigeria/nigeriaminister-says-majors-in-shale-opec-should-keep-crude-pricestableidINKBN1GH347.

1    table on pricing" in violation of the Sherman Act.[25]

2        63.    After the 2018 CERAWeek conference, Defendants began falling in

3    line. Defendant Continental's CEO attended a Saudi Aramco board meeting in May

4    2018 where he stated that shale producers should "focus more on profitability and

5    less on profligate production."[26] U.S. officials, including executives from

6    Defendants Pioneer and Hess, attended the June 2018 OPEC International Seminar

7    in Vienna where the CEO of Pioneer made the following statements: "OPEC should

8    boost daily output by roughly 1 million barrels over time;" OPEC needs "to put

9    together some kind of deal to phase into the market;" "[n]one of us want $80 to

10   $100 oil, that's too high;" "[t]here's a sweet spot between $60 and $80;" and  that

11   "OPEC needs to fulfill its duty." [27]

12       64.    At this Summit, Defendant Pioneer's CEO actively participated in

13   meetings with OPEC with CEO Sheffield and discussed Defendants' and OPEC's

14   volumes and their effects on global prices.[28]

15       65.    OPEC officials and U.S. shale executives met again at the 2019

16   CERAWeek conference. By then, this event had become an informal

17   communication channel between the cartel and fast-growing shale producers.

18

19   [25] Alex Lawler & Ernest Scheyder, *OPEC to Meet with U.S. Shale Firms in*
20   *Houston on Monday: Sources*, REUTERS (Feb. 27, 2018),
21   https://www.reuters.com/article/us-oilopecusa/opec-to-meetwith-u-s-shale-firms-in-houston-on-monday-sources-idUSKCN1GB2KP.
22   [26] Ernest Scheyder, *Continental Resources CEO Harold Hamm pulls out of OPEC*
23   *meeting*, REUTERS (June 18, 2018), https://www.reuters.com/article/us-oil-opec-contl-resourcesidUSKBN1JE1VW/.
24   [27] *Ernest Scheyder, U.S. Shale Executive Pushes OPEC to Gradually Boost Output,*
25   *REUTERS (June 20, 2018),*
     *https://www.reuters.com/article/oil-opec-pioneer-natl-rscidINKBNIJG20B.*
26   [28] Bloomberg Daybreak: Americas, *Pioneer Chairman Sees an OPEC Increase of*
27   *Up to 600,000 B/D*, BLOOMBERG (June 21, 2018),
     https://www.bloomberg.com/news/videos/2018-06-21/pioneerchairman-sees-an-opec-increase-of-up-to-600-000-b-d-video.
28

**D.  Defendants Begin to Cooperate with OPEC**

66.  Industry analysts and commentators expected the U.S. to continue rapid expansion leading to the start of a second wave of the U.S. shale revolution in 2019.[29] This revolution would have hurt OPEC's supply control.[30]  This second wave never came.

67.  In 2020, COVID-19 caused the price of oil to fall dramatically. OPEC cut production in order to stabilize prices. Low oil prices caused mergers and bankruptcies in the U.S. shale industry, further consolidating market share among industry giants.

68.  In July 2020, OPEC's Secretary General made the following statement:

> We were able to reach out to the U.S. independents and we had established a line of communication with them. We have reached some level of comfort among ourselves. They have been participating also at their own levels to ensure that this conversation is inclusive and is led by the biggest producers. There is no objective whatsoever from us as a group or as individual countries to drive U.S. shale production out of business. Everybody has a role to play. We are very much appreciative of the support and the cooperation we are getting from the U.S. both at the level of policymakers as well as from industry.[31]

69.  A few months later, the CEO of EOG Resources stated "[w]e don't want to put OPEC in a situation where they feel threatened, like we're taking market share while they're propping up oil prices," revealing the industry's decision to

---

[29] Sarah McFarlane & Pat Minczeski, *OPEC vs. Shale: The Battle for Oil Price Supremacy*, THE WALL STREET J. (Apr. 18, 2019), https://www.wsj.com/articles/opec-vs-shale-the-battle-for-oilprice-supremacy-11555588826.

[30] *Id.*

[31] OPEC Secretary General: *No objective to drive US shale out of business*, OIL & GAS J. (July 9, 2020) (emphasis added), https://www.ogj.com/generalinterest/article/14179258/opecsecretarygeneral-no-objective-to-drive-us-shale-out-of-business.

1    cooperate with OPEC.[32]

2    70.    As the industry was recovering from the COVID-19 pandemic, prices

3    started to rise. OPEC and OPEC+ countries began pushing up prices of oil.

4    Defendants began taking part in the conspiracy by suddenly and uniformly slowing

5    down production. Prices began to rise "mostly because of the declining

6    responsiveness of the shale sector."[33] Defendants held the line even as prices

7    reached levels that historically would have triggered a drilling boom. [34]

8    71.    Defendants' executives began making statements about being

9    "disciplined" in production decisions. Pioneer's CEO stated that U.S. shale oil

10    producers would stay "disciplined regardless whether it's $75 Brent, $80 Brent, or

11    $100 Brent," and indicated that shareholders will punish companies that go back to

12    growth.[35] He further predicted that major producers would not increase output in

13    response to rising prices.[36]  Defendants signaled to each other and OPEC that they

14    were abandoning their role as swing producers in 2021.

15    72.    Defendants' sudden focus on "discipline" in 2021 was unusual for

16    industry experts because U.S. shale producers normally captured market share when

---

17    [32] Kevin Crowley, et al., *The Pandemic Has Broken Shale and Left Oil Markets in*
18    *OPEC Hands*, BLOOMBERG (Nov. 28, 2020) (emphasis added),
19    https://www.bloomberg.com/news/articles/2020-1128/the-pandemic-has-broken-shale-and-left-oil-markets-in-opec-hands?embedded-checkout=true.
20    [33] *See* John Kemp, "*U.S. shale restraint pushes oil prices to multi-year high*,"
21    REUTERS (June 4, 2021), https://www.reuters.com/business/energy/us-shale-restraint-pushes-oil-prices-multi-year-high-kemp-2021-06-04/.
22    [34] *See* Liz Hampton, *U.S. shale industry tempers output even as oil price jumps*,
23    REUTERS (June 28, 2021), https://www.reuters.com/business/energy/us-shale-industry-tempers-output-even-oil-price-jumps-2021-06-28/.
24    [35] *See* Derek Brower and David Sheppard, *US shale drillers cannot contain oil*
25    *price rise, Pioneer boss says*, FINANCIAL TIMES (Oct. 3, 2021),
     https://www.ft.com/content/c21eb656-8d09-45ce-a13a-7d8419426b05.
26    [36] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale*
27    *Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021),
     https://www.reuters.com/business/energy/opec-us-oilfirms-expect-subdued-shale-
28    rebound-even-crude-prices-rise-2021-02-22/.

OPEC+ curbed its output.[37]

73.    Even as the price of oil trended upward, U.S. rigs drilling trended downward in 2021.[38] OPEC seemed unsurprised and even predicted a significant drop in U.S. shale production in 2021.[39]

**E.    Defendants Conspire with OPEC in 2022 and 2023**

74.    Crude oil prices shot up when Russia invaded Ukraine in 2022, rising to more than $120 per barrel. Once crude oil prices began to normalize, OPEC made production cuts and withheld production to maintain the high price.

75.    This resulted in record high oil prices in 2022 and into 2023. Defendants held the line by continuing to withhold production against their own rational economic self-interest. In February 2022, CEO Sheffield made comments hinting at the existence of an agreement amongst Defendants, stating that "the public independents are staying in line" and "I'm confident they will continue to stay in line." [40] CEP Sheffield indicated that this position would not change even though the price of oil had nearly doubled. That same month, Continental CEO William Berry stated, "[w]e project generating flat to 5% annual production growth

---

[37] John Kemp, *U.S. Shale Restraint Pushes Oil Prices to Multi-Year High*, REUTERS (June 4, 2021), https://www.reuters.com/article/global-oil-kemp-idAFL5N2NM37M.

[38] Ernest Sheyder, *Nigeria Prime Minister says majors in shale, OPEC should keep crude price stable*, REUTERS (Mar. 5, 2018), https://www.reuters.com/article/us-ceraweekenergynigeria/nigeriaminister-says-majors-in-shale-opec-should-keep-crude-pricestableidINKBN1GH347.

[39] Alex Lawler & Jennifer Hiller, *OPEC, U.S. Oil Firms Expect Subdued Shale Rebound Even as Crude Prices Rise*, REUTERS (Feb. 23, 2021), https://www.reuters.com/business/energy/opec-us-oilfirms-expect-subdued-shale-rebound-even-crude-prices-rise-2021-02-22/.

[40] Tsvetana Paraskova, *Not Even $200 Oil Will Make Shale Giants Drill Aggressively*, OILPRICE.COM (Feb. 18, 2022), https://oilprice.com/Energy/Energy-General/Not-Even-200-Oil-Will-Make-ShaleGiants-DrillAggressively.html#:~:text=The%20largest%20U.S.%20shale%20producers,shale%20firms%20said%20this%20week.

over the next five years." [41] It was further reported that EOG Resources Inc. also planned to fall in line with most other U.S. independent shale producers by restraining oil growth.[42]

76.    Defendants and OPEC met again in March 2022 where OPEC's Barkindo stated "we need to work together to exploit that relationship." [43]

77.    During the 2022 CERA Week Conference, Defendants gifted Secretary Barkindo a bottle labeled "Genuine Barnett Shale," from the oil field that started the U.S. shale revolution — signaling that their bitter rivalry has ended.[44] OPEC and Defendants did not boost production even as prices surged over $100 a barrel.[45]

78.    This position of restraint continued into 2023 with Pioneer CEO Sheffield declaring that the "aggressive growth era of US shale is over" and that Defendants were no longer swing producers.[46]

79.    In the beginning of 2023, Defendants made clear that they were coordinating with OPEC on oil prices by pulling back on previously held hedge positions to protect against downward price movements on oil — leaving them

---

[41] *Id.*

[42] Kevin Crowley, *EOG Holds Back Oil-Production Growth in Line with Shale Peers*, BLOOMBERG (Feb. 24, 2022), https://www.bloomberg.com/news/articles/2022-02-24/eog-holds-back-oilproduction-growth-in-line-with-shale-peers.

[43] *See* "*OPEC meets with U.S. shale executives as oil prices skyrocket*," AL ARABIYA (March 9, 2022), https://english.alarabiya.net/business/energy/2022/03/08/OPEC-meets-with-US-shale-executives-as-oil-prices-skyrocket.

[44] Liz Hampton, *As Oil Prices Soar, U.S. Shale, OPEC in no Rush to Resume Price War*, REUTERS (Mar. 10, 2022), https://www. https://www.reuters.com/business/energy/ceraweek-oil-prices-soar-usshale-opec-no-rush-resume-price-war-2022-03-10).

[45] *Id.*

[46] https://www.shaledirectories.com/newsletter/facts-rumors-newsletter-504-march-18-2023/.

vulnerable to significant economic risk if oil prices declined.[47] CEO Sheffield was strangely optimistic that prices would be at $100 a barrel before the end of the year and declared that there was no need to hedge.[48] CEO Sheffield even predicted that OPEC would make another cut due to a recent price fall in January 2023.[49] This proved to be true when OPEC announced a shocking cut of 1.1 million barrels of oil production per day. The failure to hedge can only be explained by Defendants' having advanced knowledge of OPEC's production cuts.

80.    In March 2023, around two dozen U.S. shale executives reaffirmed their commitment to withholding production and exchanged information on forward-looking production estimates at a dinner with OPEC Secretary General elect Haitham Al Ghais.[50] The dinner was attended by executives of Defendants Pioneer, Diamondback Energy, Occidental Petroleum, and Hess Corporation.[51]

81.    Meanwhile, Defendants' restraint and refusal to gain market share confused industry commentators with one industry expert commenting: "OPEC and shale are much more on the same team now, with supply discipline on both sides."[52] It was reported that in April 2023 that consistent with a three-year trend, the U.S.

---

[47] Justin Jacobs, *Shale Oil Drillers Left Exposed After Pulling Back Price Hedges*, FIN. TIMES (Mar. 28, 2023), https://www.ft.com/content/c3baf69f-41fc-42ea-b13a-5ef6f546e143.
[48] *Id.*
[49] Kevin Crowley, *One Shale Executive Correctly Called OPEC+'s Surprise Output Cut*, BLOOMBERG (Apr. 4, 2023), https://www.bloomberg.com/news/articles/2023-04-04/one-shaleexecutive-correctly-called-opec-s-surprise-output-cut?sref=NqTCpwwa.
[50] Stanley Reed, *Mohammad Barkindo, OPEC's top official, dies*, N.Y. TIMES (July 6, 2022), https://www.nytimes.com/2022/07/06/business/opec-barkindo.html.
[51] *Id.*
[52] Kevin Crowley and Mitchell Ferman, *Don't Expect US Shale to Quickly Fill the Gap Left by OPEC+ Cut*, BLOOMBERG (Apr. 3, 2023), https://www.bloomberg.com/news/articles/2023-0403/opec-surprise-cut-won-t-be-filled-by-us-shale-oil?in_source=embedded-checkout-banner.

shale industry did not plan to increase production in response to rising oil prices.[53]

82.    Defendants' choice to cooperate with OPEC by restraining output and foregoing market share has resulted in massive revenue increases.

**F.    Factors that Show Defendants' Collusion to Restrict Production of Crude Oil**

83.    Defendants have a financial incentive to control oil prices at artificially inflated levels by sharing information and controlling output like OPEC and OPEC+.

84.    Defendants extensively communicated with OPEC and OPEC+ officials at conferences like CERAWeek where they exchanged important information for cooperation.

85.    Defendants share common investor ownership which allows Defendants to easily communicate and coordinate as a whole with OPEC and each other.

86.    The FTC has found that Pioneer CEO Sheffield worked to "align U.S. oil production with OPEC and OPEC+ country output agreements, thereby cementing the cartel's position and sharing in the spoils of its market power." [54] The FTC's investigation into CEO Sheffield's private and public communications prompted a referral to the U.S. Department of Justice for criminal prosecution and a civil investigation into whether other executives at major oil companies communicated improperly with OPEC.[55] [56]

---

[53] *Id.*

[54] *In the Matter of Exxon Mobil Corporation*, 89 Fed. Reg. 42875-02 (May 16, 2024).

[55] *See* Liz Hoffman and Gina Chon, "*FTC plans to recommend a possible criminal case against ex-Pioneer CEO*," Semafor (May 2, 2024); *See* Mitchell Ferman, Leah Nylen, and Jennifer Dlouhy, "*FTC Eyes Oil Bosses' Texts for Signs of Collusion With OPEC*," BLOOMBERG (July 19, 2024).

[56] *See* Mitchell Ferman, Leah Nylen, and Jennifer Dlouhy, "*FTC Eyes Oil Bosses' Texts for Signs of Collusion With OPEC*," BLOOMBERG (July 19, 2024).

87.    Defendants acted against their economic self-interest by choosing not to increase production as crude oil prices rose despite individual incentives to capture market share unlike smaller and less powerful U.S. shale oil producers.

**V.    DEFENDANTS' INFLUENCE ON GLOBAL OIL PRICES**

88.    Defendants collectively possessed the power to significantly impact global oil prices.

89.    Global oil consumption tends to be relatively stable, with significant demand fluctuations influenced by long-term trends.

90.    Trends in long-term demand have corresponding trends in long-term supply. Over time, increasing demand leads to substantial capital investments in large-scale oil projects, usually led by major oil companies. Sponsors dedicate significant up-front capital based on long-term demand forecasts, anticipating that the projects will produce oil at low marginal costs for many years, allowing them to sell oil at a steady profit and yield strong returns.

91.    These large projects have minimal impact on global prices in the medium term because of lengthy planning development periods. But they do influence the long-term global supply landscape.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

92.    Oil supply and demand can fluctuate significantly over shorter time frames, but these variations are within a narrow range of the overall market. Such



fluctuations are depicted as smaller peaks and troughs in the chart above, even though the general trend is upward.[57] The most significant demand drops occurred during the COVID-19 pandemic with declines of 7.48 million barrels per day (Mmbd) and 6.89 Mmbd in Q1 and Q2 of 2020, respectively, from a pre-COVID baseline of approximately 102 Mmbd. Excluding the COVID crisis, the most notable demand shift in the last 18 years was a decrease of 1.95 Mmbd in Q2 of 2005. On average, global oil demand varied by just over 1 Mmbd per quarter, which is an average fluctuation of about 1.2% throughout the period.

93.    Global cured oil production also fluctuates within a narrow range. On average, supply changes from quarter to quarter are around just 0.82 Mmbd.

94.    Small fluctuations in supply and demand and financial market expectations influence short and medium-term changes in global oil prices. For example, during OPEC's price war in the latter half of 2014, global oil supply rose by just 3.03 Mmbd compared to Q2 levels, while global demand increased by 1.53

---

[57] *See* https://www.eia.gov/.

Mmbd. This 1.5 Mmbd shift in the supply-demand balance—about 2% of total production—caused crude oil prices to plummet from $105.79 per barrel in June 2014 to $59.29 in December. Thus, a 2% shift in oil supply resulted in a 47% decrease in price.

95.    Beginning in 2022, as part of the conspiracy, Defendants collectively produced over 1 Mmbd of crude oil at deliberately constrained levels. While this is a small portion of the global oil supply, it is nimble output at the margin, crucial to the balance of supply and demand. Defendants also controlled additional potential production that could be ramped up in months.

96.    Combining OPEC, OPEC+, and Defendants' production capacity results in a cartel that controls around 60% of global oil production.

## VI.    FURTHER INDICATORS OF COLLUSION

97.    Statements from OPEC and Defendants quoted above demonstrate explicit coordination of production cuts. Defendants' parallel actions in collectively limiting oil production further support collusion.

98.    Generally, it is well-established that the oil industry is exceptionally prone to collusion on production levels, thereby enabling powerful cartels. It fosters an environment conducive to price-fixing negotiations amongst competitors because it is a quintessential commodity with interchangeable products.

99.    Defendants have had numerous opportunities for collusion with OPEC at previously detailed industry events including trade association events and the annual CERAWeek Conference in Houston, Texas. At these events, Defendants discussed internal coordination and collective efforts to manage surplus capacity with OPEC. Public reports from participants confirm that these meetings were aimed to encourage cooperation between OPEC and Defendants.

100.    The OPEC and OPEC+ cartels control most of the segment of the oil market that affects prices—the short-term productive capacity to swiftly adjust supply in response to price signals. Defendants manage a substantial share of the

remaining productive capacity. While the global oil market is diverse, over 60% of it is controlled directly by cartels.

101. Crude oil sold in the U.S. is a daily-use commodity with few substitutes for many consumers and high switching costs, making it vulnerable to the price effects of collusion. This inelasticity extends to downstream products where crude oil is a key input. The market for crude oil in the U.S. is susceptible to the price effects of collusion because it, and down downstream products, is a daily-use commodity with no substitute, leading to rigid demand which enables cartels to extract monopoly rents from customers.[58]

102. Even though Defendants had strong individual incentives to increase production during the relevant period, they did not. This only makes economic sense if they made mutual agreements to limit production. Defendants engaged in extensive interfirm communications, both publicly and privately regarding competitively sensitive information.

**VII.    INJURY RELATED TO ANTITRUST**

**G.    During the Relevant Period, Defendants' Conspiracy to Limit Shale Oil Production Inflated the Price of Crude Oil.**

103. The Defendants' control over a substantial share of short-term productive capacity provides them significant influence over crude oil prices, which has been associated with fluctuations in oil prices related to U.S. shale oil production.

104. The Defendants have collectively chosen not to exercise their

---

[58] The gasoline market has rigid demand, meaning that few consumers will switch to alternative products even if pump prices increase. This further amplifies the rigidity of upstream demand for crude oil.

influence.[59]

105.   Since at least 2021, the Defendants have collectively coordinated their production decisions, leading to lower production growth rates than what would be expected in a competitive market with high oil prices and strong global demand. Even though supermajors and smaller producers increased production, Defendants' production restraint significantly curtailed U.S. shale production. In 2022, U.S. shale oil production fell 50% short of market analysts' general yearly forecasts.[60]

106.   As a result, a substantial disparity emerged between the oil supply on the market and the supply that would have been available without Defendants' conspiracy, causing oil prices to rise above what would have occurred in a competitive market. This led to higher prices at the pump for Plaintiff.

### H.   Defendants' Agreement to Limit Shale Oil Production Drove up Prices of Gasoline and Diesel Fuel Purchased by the Plaintiff

107.   Plaintiff obtained gasoline and diesel fuel from gas stations and City managed fueling sites. Around 54-57% of the U.S. price of gasoline is attributed to the cost of crude oil used in its production.[61]  Crude oil accounts for roughly 45% of the pump price for diesel fuel.

108.   Other costs such as refining, taxes, distribution, and marketing remain

---

[59] Stanley Reed, *As Oil Soars, OPEC and Its Allies Decline to Offer Relief*, N.Y. TIMES (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/business/oil-prices-opec.html ("[e]xecutives of several companies, including [Defendant] Pioneer Natural Resources . . . and [Defendant] Continental Resources, have said in recent days that they were committed to limiting production to avoid oversupplying the market and pushing down prices...")

[60] Eric Rosenbaum, *Oil CEOs Are Doubling Down on Buybacks as Biden Budget Seeks to Quadruple Tax*, CNBC (Mar. 7, 2023), https://www.cnbc.com/2023/03/07/oxy-ceo-doesnt-seem-worried-about-politics-of-buybacks-gas-prices.html.

[61] The rest of the gasoline price is driven by distribution and marketing costs (16%), refining costs (14%), and taxes (16%). *The Four Main Factors that Influence U.S. Gas Prices*, U.S. DEP'T OF ENERGY (Last Visited Sept. 6, 2024), https://www.energy.gov/sites/default/files/2023-04/GasPriceFactors2.jpg.

1  generally stable, while the price of crude oil fluctuates frequently and experiences
2  significant swings because it is actively traded in financial markets. For example,
3  between March and August 2022, the WTI spot crude oil price varied from below
4  $50 per barrel to over $120. On March 9, 2022, alone, the oil price fell nearly $15
5  per barrel, a drop of over 11%. The U.S. Energy Information Administration noted,
6  "[r]etail gasoline prices are mainly affected by crude oil prices...." [62], which is also
7  applicable to diesel fuel.

8      109.   Defendants' own trade association, The American Petroleum Institute,
9  acknowledges that "the price of crude oil is the primary determinant of the price we
10  pay at the pump" and that "[n]ationwide on a quarterly basis, crude oil prices have
11  explained more than 90% of the variation in [U.S.] gasoline prices since 2020." [63]

12      110.   It's no surprise that crude oil significantly impacts gasoline and diesel
13  prices because of its flow through the supply chain. Defendants and other oil
14  producers sell crude oil to refineries, which process it into gasoline, diesel, and other
15  products. Refined fuels are then sent to bulk storage facilities. Since crude oil is the
16  main ingredient for refining gasoline and diesel, the Defendants' conspiracy directly
17  affected the Plaintiff, forcing it to pay inflated prices. Gas stations and fueling sites
18  buy fuel at wholesale prices tied to the cost of crude oil, including the prices set by
19  Defendants. They then mark up these prices, passing the increase on to consumers.

---

[62] U.S. Energy Information Administration (EIA), Gasoline Explained: Factors Affecting   Gasoline Prices (Feb. 22, 2023), https://www.eia.gov/energyexplained/gasoline/factors-affecting-gasoline-prices.php.
[63] *Gas Prices Explained: Five Fast Facts About U.S. Gasoline Price*s, AM. PETROLEUM INST., https://www.api.org/oil-and-natural-gas/energy-primers/gas-prices-explained#:~:text=The%20primary%20factors%20impacting%20gasoline. *See also* Factors that impact gas prices, NACS  (Apr. 05, 2023) https://www.convenience.org/Topics/Fuels/The-Price-Per-Gallon("Retail gasoline prices move an estimated 2.4 cents per gallon for every $1 change in the price per barrel [of crude oil].").

111. According to the National Association of Convenience Stores, gas stations typically add about 35 cents per gallon to the wholesale price.[64]

112. Thus, crude oil prices directly affect retail and wholesale gasoline prices.[65] Fluctuations in crude oil prices — the main raw material for refining gasoline and diesel in the U.S. — lead to changes in gasoline and diesel prices paid by Plaintiff throughout the relevant period. As a result, the Defendants' conspiracy directly impacted Plaintiff, forcing it to buy gasoline and diesel at artificially inflated prices. Both commercial buyers and end consumers experienced the effects of these inflated prices. Nearly all analysts agree that shock oil prices are almost fully passed through to the spot gasoline prices with on average 60% of changes in bulk spot prices in retail prices within two weeks, 80% within four weeks, and 100% within seven weeks.[66] Diesel exhibits similarly high pass-through rates.

113. Further, while retail gasoline and diesel prices adjust quickly to price increases, they are slower to respond when oil prices fall.[67] This effect, known as

---

[64] https://www.convenience.org/Media/conveniencecorner/Who-Makes-Money-Selling-Gas.

[65] In his 2023 State of the Union, President Biden said that U.S. gasoline prices were too high because oil producers invested "too little" of their "record profits" to ramp up domestic production and "used those record profits to buy back their own stock, rewarding their CEOs." *See* Ian Thomas, *U.S. won't reach a new record in oil production 'ever again,' says Pioneer Natural Resources CEO,* CNBC (Mar. 9, 2023), https://www.cnbc.com/2023/03/09/us-wont-reach-new-record-oil-production-ever-again-pioneer-ceo.html.

[66] FTC Bureau of Economics, *Gasoline Price Changes and the Petroleum Industry: An Update*, at 38 (2011). In the U.S., regions with the fastest speeds, such as the Gulf Coast and Midwest, see full pass-through of price changes within four to six weeks.

[67] Matthew Chesnes, *Asymmetric Pass-Through in U.S. Gasoline Prices*, Bureau of Economics Federal Trade Commission Working Paper No. 302 (June 18, 2010) ("This paper presents new evidence of asymmetric pass-through, the notion that upward cost shocks are passed through faster than downward cost shocks, in U.S. gasoline prices."), https://www.ftc.gov/sites/default/files/documents/reports/asymmetric-pass-through-u.s.gasoline-prices/wp302_0.pdf.

1   known as "rockets and feathers," and/or "asymmetric pass-through," demonstrates
2   the immediate and lasting impact of Defendants' artificially inflated prices on
3   commercial purchasers.

4       114.   Plaintiff also purchased light petroleum products in "rack sales,"
5   wholesale sales where title transfers at the terminal.[68] Rack purchases are typically
6   made from wholesalers along the fuel distribution system and are usually governed
7   by contracts that include a benchmark price, fees, taxes, and transportation costs.
8   Plaintiff purchased light petroleum products in rack sales from wholesale suppliers
9   and the prices paid by Plaintiff in these rack sales were directly impacted by the
10  increased price of crude oil because an increase in crude oil prices increases the
11  price of light petroleum products.

12  **VIII. <u>CLAIMS FOR RELIEF</u>**

13  **<u>FIRST CLAIM FOR RELIEF</u>**
14  **VIOLATION OF THE SHERMAN ACT**
15  **(15 U.S.C. § 1)**

16      115.   Plaintiff realleges and incorporates, as though fully set forth herein,
17  each and every allegation set forth in the preceding paragraphs of this Complaint.

18      116.   From at least January 1, 2021 to the present, Defendants and their co-
19  conspirators entered into a conspiracy, continuing agreement, and understanding in
20  restraint of trade artificially to fix, raise, and stabilize price for crude oil and
21  gasoline and diesel fuel in the United States, including by restraining their
22  respective production volumes, in violation of Section 1 of the Sherman Act (15
23  U.S.C. §1).

24      117.   In carrying out and formulating the alleged agreement, understanding,
25  and conspiracy, Defendants and their co-conspirators did those things that they
26  combined and conspired to do, including but not limited to the acts, practices, and

27
28  [68] *See* U.S. Energy Information Administration, "Glossary" (defining "rack sales").

course of conduct set forth above, and the fixing, raising, and stabilizing of the price of crude oil, gasoline, and diesel fuel.

118. The combination and conspiracy alleged herein has had the following effects, among others:

      a. Prices for crude oil sold by Defendants and all of their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States;

      b. Price competition for the sale of crude oil has been restrained, suppressed, and/or eliminated in the United States; and

      c. Those who purchased gasoline or diesel fuel indirectly from Defendants and their co-conspirators for their commercial use and at rack rates have been deprived of the benefits of free and open competition, and paid artificially high prices for gasoline and/or diesel fuel.

119. Plaintiff has been injured and will continue to be injured in its businesses and property by paying higher prices for gasoline and/or diesel fuel purchased indirectly from the defendants and their co-conspirators for their commercial use than they would have paid and will pay in the absence of the combination and conspiracy.

120. Plaintiff is entitled to an injunction preventing and restraining the violation alleged herein against Defendants.

<u>**SECOND CLAIM FOR RELIEF**</u>

**VIOLATION OF CALIFORNIA CARTWRIGHT ACT**
(**Cal. Bus. & Prof. Code §16720**)

121. Plaintiff repeats and realleges, as if fully set forth herein, each allegation, and each of the state-specific causes of action described below incorporate the allegations as if fully set forth therein.

122. The Defendants' conspiracies had the following effects: (1) price competition for crude oil, gasoline, and diesel fuel was restrained, suppressed, and

eliminated throughout California; (2) gasoline and diesel fuel prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals have been deprived of free and open competition.

123.   Throughout the relevant time period, Defendants' illegal conduct substantially affected California commerce and consumers.

124.   The Defendants have entered into an unlawful agreement in restraint of trade, in violation of Cal. Bus. & Prof. Code §16700 *et seq*. Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of trade and commerce.

125.   Each Defendant has acted in violation of Cal. Bus. & Prof. Code §16720 to fix, reduce, stabilize, and maintain crude oil production. The violations of Cal. Bus. & Prof. Code §16720 consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, reduce, maintain, and stabilize the production of domestic shale oil. For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of gasoline and diesel fuel. As a result of the Defendants' violation of Cal. Bus. & Prof. Code §16720, the Plaintiff seeks treble damages and its cost of suit, including a reasonable attorneys' fee, pursuant to Cal. Bus. & Prof. Code §16750(a).

## THIRD CLAIM FOR RELIEF
### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### (Cal. Bus. & Prof. Code §17200 *et seq*.)

126.   Plaintiff repeats and realleges, as if fully set forth herein, each allegation, and each of the state-specific causes of action described below incorporate the allegations as if fully set forth therein.

127. Based on the foregoing, the Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §17200 *et seq*., and, accordingly, the Plaintiff seeks all relief available under that statute.

## IX.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that:

A.  The Court adjudge and decree that the acts of Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal as a quick look or full-fledged rule of reason violation) of state antitrust and competition law as alleged above;

B.  The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

C.  The Court enter judgment against Defendants, jointly and severally, and in favor of Plaintiff for treble the amount of damages sustained by Plaintiff as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law; and

D.  The Court award Plaintiff such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## X.  <u>JURY TRIAL DEMANDED</u>

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: November 1, 2024          MARA W. ELLIOTT, City Attorney

By:   */s/ Mark Ankcorn*

Mark Ankcorn
Senior Chief Deputy City Attorney
mankcorn@sandiego.gov

*Attorneys for Plaintiff City of San Diego*

COMPLAINT